## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| NARANBOLD GANTULGA, derivatively on behalf of AMC ENTERTAINMENT HOLDINGS, INC.,<br><br>    Plaintiff,<br><br>    vs.<br><br>ADAM M. ARON, CRAIG R. RAMSEY, CHRIS A. COX, LIN ZHANG, JACK Q. GAO, MAOJUN ZENG, ANTHONY J. SAICH, LLOYD HILL, GARY F. LOCKE, HOWARD W. KOCH, JR., and KATHLEEN M. PAWLUS,<br><br>    Defendants,<br><br>    and<br><br>AMC ENTERTAINMENT HOLDINGS, INC.,<br><br>    Nominal Defendant. | Case No.: 18-2262<br><br><br><br>**DEMAND FOR JURY TRIAL** |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Naranbold Gantulga ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant AMC Entertainment Holdings, Inc. ("AMC" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Adam M. Aron, Craig R. Ramsey, Chris A. Cox, Lin Zhang, Jack Q. Gao, Maojun Zeng, Anthony J. Saich, Lloyd Hill, Gary F. Locke, Howard W. Koch, Jr., and Kathleen M. Pawlus (collectively, the "Individual Defendants" and together with AMC, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of AMC, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his

own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding AMC, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by AMC's directors and officers from December 20, 2016 through the present (the "Relevant Period").

2.      AMC is currently the largest chain of movie theaters in the world, operating in North America and Europe.

3.      Box office admissions constitute the Company's largest source of revenue, followed by food and beverage sales. AMC earns additional income from its loyalty program, AMC Stubs, theater rentals, gift cards, and on-line ticketing fees.

4.      In August 2012, AMC was acquired by Dalian Wanda Group Co. ("Wanda"). Wanda holds 100% of the Company's outstanding Class B shares, which have treble the voting power of Class A shares. As a result, Wanda controls approximately 80% of the shareholder voting power over AMC.

5.      During 2016 and early 2017, AMC acquired several other movie theater chains operating in the U.S. and Europe, including:

(a)      U.S. based Carmike Cinemas Inc. ("Carmike"), for $858.2 million;

(b)     Europe based Odeon and UCI Cinemas Holdings Limited for $637 million; and

(c)     Europe based Nordic Cinema Group Holding AB for $964 million.

6.      On December 21, 2016, the Company filed a shelf registration statement on Form S-3 with the SEC to permit AMC and its selling stockholders to offer or sell, from time to time, AMC shares in a secondary public offering ("SPO"). On February 9, 2017, AMC filed a prospectus with the SEC offering to register 21,904,761 common shares in the SPO for $31.50 per share. The prospectus and registration statement made a number of false and misleading statements and omissions of facts necessary to prevent other statements from being misleading.

7.      The registration statement inaccurately portrayed Carmike's revenue growth for the first nine months of 2016, despite the fact that Defendant Adam Aron had asserted on December 20, 2016 that AMC had "plenty of time to look at . . . Carmike" and understand and analyze Carmike's operations.

8.      Further, the registration statement, which incorporated by reference various SEC filings, failed to disclose material changes that were having an adverse impact on Carmike's business at the time of the SPO.

9.      The registration statement also made false and misleading statements and omissions regarding the Company's newly acquired international businesses, including statements regarding seasonality and margins on food and beverage sales.

10.     AMC sold 20,330,874 common shares in the SPO, realizing net proceeds of approximately $618 million.

11.     After markets closed on August 1, 2017, the Company issued a press release announcing disappointing preliminary financial results for the quarter ended June 30, 2017.

12.     On this news, the price per share of AMC stock dropped $5.60, or nearly 27%, from the previous day's closing price to close at $15.20 on August 2, 2017.

13.     During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

14.     During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to AMC, willfully or recklessly made false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made false and misleading statements and omissions of material fact that failed to disclose that: (1) the operations of Carmike had been experiencing a prolonged period of financial underperformance due, in large part, to a protracted period of underinvestment in its theaters; (2) Carmike had experienced a significant loss in market share when its loyal patrons migrated to competitors that had renovated and upgraded their theaters; (3) AMC was able to retain only a very small number of Carmike's loyalty program members after the Carmike acquisition; (4) that the issues identified in (1)-(3) above were then having a material adverse effect on Carmike's operations and theater attendance and, in response, AMC planned to boost visitation levels at Carmike theaters by materially expanding promotional and capital investment spending activity, which was reasonably likely to have a material adverse effect on AMC's near term operating results; (5) the Company's representations about the seasonality of AMC's business were materially false and misleading; (6) the representations concerning Carmike's operations and the seasonality of its business, AMC's management's discussion and analysis of financial condition, and AMC's disclosure controls were materially false and misleading; and (7) as a result of the foregoing, the Company lacked a reasonable basis for its positive statements about AMC's then-current business and future financial prospects,

including their statements relating to AMC's financial guidance, as well as the cost synergies associated with the "flawless" integration of Carmike.

15. The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

16. Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

17. The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's Chief Executive Officer ("CEO"), the Company's Chief Financial Officer ("CFO"), the Company's Chief Accounting Officer, all of the current members of the Company's Board of Directors (the "Board"), and two former member of its Board to two federal securities fraud class action lawsuits pending in the United States District Court for the Southern District of New York (the "Securities Class Actions"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

18. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

19. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of all of them in the Securities Class Actions, and of their not being

disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Securities Act of 1933 and the Exchange Act.

21.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

24.     Plaintiff is a current shareholder of AMC. Plaintiff has continuously held AMC common stock at all relevant times.

**Nominal Defendant AMC**

25.     AMC is a Delaware corporation with its principal executive offices at One AMC Way, 11500 Ash Street, Leawood, KS 66211. AMC's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "AMC."

**Defendant Aron**

26.     Defendant Adam M. Aron ("Aron") has served as the Company's CEO, President and as a Company director since January 2016. According to the Company's Schedule 14A filed with the SEC on March 17, 2017 (the "2017 Proxy Statement), as of February 28, 2017, Defendant Aron beneficially owned 51,747 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2017 was $31.35, Aron owned over $1.6 million worth of AMC stock.

27.     For the fiscal year ended December 31, 2016, Defendant Aron received $10,932,004 in compensation from the Company. This included $991,200 in salary, a $4.5 million bonus, $4,281,202 in stock awards, $1,144,250 in non-equity incentive plan compensation, and $15,352 in all other compensation.

28.     The Company's 2017 Proxy Statement stated the following about Defendant Aron:

*Mr. Adam Aron, 62,*[1] has served as Chief Executive Officer, President and a director of the Company since January 2016. From February 2015 to December 2015, Mr. Aron was appointed Chief Executive Officer of Starwood Hotels and Resorts Worldwide, Inc. Since 2006, Mr. Aron has served as Chairman and Chief Executive Officer of World Leisure Partners, Inc., a personal consultancy for matters related to travel and tourism, high-end real estate development, and professional sports, that he founded. Mr. Aron served as Chief Executive Officer and Co-Owner of the Philadelphia 76ers from 2011 to 2013, and remains a co-owner currently. From 2006 to 2015, Mr. Aron served as Senior Operating Partner of Apollo Management L.P. Mr. Aron currently serves on the board of directors of Norwegian Cruise Line Holdings, Ltd. and the Philadelphia 76ers. Mr. Aron served on the board of directors of Prestige Cruise Holdings, Inc. from 2007 to 2014. Mr. Aron received a Master's of Business Administration degree with distinction from the Harvard

---

[1] Emphasis in original unless otherwise noted throughout.

Business School and a bachelor of arts degree cum laude from Harvard College. Mr. Aron brings to the Board significant business and executive leadership experience, including valuable insight into consumer services. He has more than 20 years of experience as a Chief Executive Officer, more than 26 years of experience as a corporate director, and more than 36 years of consumer-engagement experience

29.     Upon information and belief, Defendant Aron is a citizen of Kansas.

**Defendant Ramsey**

30.     Defendant Craig R. Ramsey ("Ramsey") has served as the Company's CFO since June 2007. According to the 2017 Proxy Statement, as of February 28, 2017, Defendant Ramsey beneficially owned 84,418 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2017 was $31.35, Defendant Ramsey owned over $2.6 million worth of AMC stock.

31.     For the fiscal year ended December 31, 2016, Defendant Ramsey received $2,659,220 in compensation from the Company. This included $563,800 in salary, a $700,000 bonus, $962,930 in stock awards, $48,906 in change in pension value and nonqualified deferred compensation earnings, $363,078 in non-equity incentive plan compensation, and $20,506 in all other compensation.

32.     The Company's Form 10-K for the fiscal year ended December 31, 2016 filed with the SEC on March 10, 2017 (the "2016 10-K") stated the following about Defendant Ramsey:

*Mr. Craig R. Ramsey* has served as Executive Vice President and Chief Financial Officer of AMC since April 2002. Mr. Ramsey served as Interim Chief Executive Officer and President of the Company from August 7, 2015 until January 4, 2016. Mr. Ramsey served as Secretary of the Company from April 2002 until April 2003. Mr. Ramsey served as Senior Vice President, Finance, Chief Financial Officer and Chief Accounting Officer from August 1998 until May 2002. Mr. Ramsey served as Vice President, Finance from January 1997 to August 1998, and prior thereto, Mr. Ramsey had served as Director of Information Systems and Director of Financial Reporting since joining AMC in February 1995. Mr. Ramsey has over 30 years of experience in finance in public and private companies. Mr. Ramsey serves

on the board of directors for Open Road Releasing. Mr. Ramsey holds a B.S. degree in Accounting and Business Administration from the University of Kansas.

33.     Defendant Ramsey is a citizen of Kansas.

**Defendant Cox**

34.     Defendant Chris A. Cox ("Cox") has served as the Company's Senior Vice President and Chief Accounting Officer since June 2010. As per a Form 4 filed with the SEC on January 3, 2018, Defendant Cox owned 10,284 shares of AMC stock as of that date. Given that the price per share of the Company's common stock at the close of trading on January 3, 2018 was $15.00, Defendant Cox owned over $154,260 worth of AMC stock.

35.     The Company's 2016 10-K stated the following about Defendant Cox:

*Mr. Chris A. Cox* has served as Senior Vice President and Chief Accounting Officer of AMC since June 2010. Prior thereto Mr. Cox served as Vice President and Chief Accounting Officer since May 2002. Prior to May 2002, Mr. Cox had served as Vice President and Controller since November 2000. Previously, Mr. Cox had served as Director of Corporate Accounting for the Dial Corporation from December 1999 until November 2000. Mr. Cox holds a Bachelor of Business Administration in Accounting and Finance degree from the University of Iowa.

36.     Upon information and belief, Defendant Cox is a citizen of Kansas.

**Defendant Gao**

37.     Defendant Jack Q. Gao ("Gao") has served as a Company director from September 2015 until he announced his resignation October 27, 2017.

38.     According to the Company's 2017 Proxy Statement:

In December 2016, Wanda agreed to make a capital contribution of $10,000,000 to AMC (without any increase in Wanda's economic interest or voting rights in the Company) for payment to certain officers, directors, and other personnel for extraordinary services rendered in connection with merger and acquisition activity in 2016. This contribution was received during February 2017. As a result of these activities Mr. Jack Q. Gao received a bonus in the amount of $1,500,000 related to his service as a director.

39.     The Company's 2017 Proxy Statement stated the following about Defendant Gao:

*Mr. Jack Q. Gao, 58*, has served as a director of the Company since September 2015. Mr. Gao serves as the Group Vice President of Wanda Cultural Industry Group and the Chief Executive Officer of Wanda Film Holdings Company and has held such positions since joining Wanda Group in June 2015. Prior to joining Wanda, Mr. Gao served as Founder of GAO Entertainment, LLC from January to May 2015. Mr. Gao served as Senior Corporate Vice President for News Corporation from 2006 to 2014. His roles at News Corporation included serving as Chief Executive Officer of News Corporation China Investments; Chief Executive Officer of Star TV China Company; Chairman of MySpace China; and Chief Representative of News Corporation Beijing Representative Office. Mr. Gao directed News Corporation strategy, government relations, business development, strategic investments and Star TV's overall sales, distribution and production operations in China. Mr. Gao serves on the board of directors of Infront Sports and Media AG, Beijing Vantone Industrial Co. Ltd., AGTech Holding Ltd. and Mr. Gao served on the board of directors of AirMedia Group Inc. from 2014 to 2015 and Bona Film Group Ltd. from 2012 to 2014. Mr. Gao has served as an Adjunct Professor for the Business School at the Chinese University of Hong Kong. Mr. Gao graduated from the Harbin Institute of Technology and the University of California, Los Angeles with a bachelor's degree, masters degree, and a Ph.D. degree in Engineering. Mr. Gao brings to the board valuable insight into business strategies and development, many years of experience as a senior executive, and experience serving on the boards of other companies.

### **Defendant Hill**

40.     Defendant Lloyd Hill ("Hill") has served as a Company director since December 2013 and sits on the Audit Committee. According to the 2017 Proxy Statement, as of February 28, 2017, Defendant Hill beneficially owned 13,090 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2017 was $31.35, Hill owned over $410,370 worth of AMC stock.

41.     For the fiscal year ended December 31, 2016, Defendant Hill received $168,704 in compensation from the Company. This included $70,000 in fees paid or earned in cash, and $98,704 in stock awards.

42.     The Company's 2017 Proxy Statement stated the following about Defendant Hill:

*Mr. Lloyd Hill, 73*, has served as a director of the Company since December 2013. Prior to his retirement in 2006, Mr. Hill served as the Chief Executive Officer and Chairman of Applebee's International, Inc. Mr. Hill serves on the board of directors

and as chairman of the compensation committee and member of the audit committee of Red Robin Gourmet Burgers, Inc. and on the board of directors of E.E. Newcomer Enterprises, Inc. Mr. Hill also serves on the board of directors of Saint Luke's South Hospital, the audit committee for the Saint Luke's Health System and the development board for the University of Texas Medical Branch. Mr. Hill holds a master's degree in business administration from Rockhurst University in Kansas City, Missouri. Mr. Hill has extensive experience and knowledge of public company operations, as well as experience serving on the boards of other public companies.

43.     Upon information and belief, Defendant Hill is a citizen of Kansas.

**Defendant Koch**

44.     Defendant Howard W. Koch, Jr. ("Koch") has served as a Company director since October 2014. According to the 2017 Proxy Statement, as of February 28, 2017, Defendant Koch beneficially owned 6,952 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2017 was $31.35, Koch owned over $217,945 worth of AMC stock.

45.     For the fiscal year ended December 31, 2016, Defendant Koch received $158,704 in compensation from the Company. This included $60,000 in fees paid or earned in cash, and $98,704 in stock awards.

46.     The Company's 2017 Proxy Statement stated the following about Defendant Koch:

*Mr. Howard W. "Hawk" Koch, Jr., 71*, has served as a director of the Company since October 2014. Mr. Koch is a veteran movie producer and principal at The Koch Company, the former president of the Academy of Motion Picture Arts and Sciences ("AMPAS"), and President Emeritus of the Producers Guild of America. Mr. Koch currently serves on the Board of Directors of the Motion Picture & Television Fund and the National Film Preservation Foundation. Mr. Koch previously served on the Board of Governors of AMPAS from 2004 to 2013 and the Board of Directors of the Producers Guild of America from 1999 to 2012. Mr. Koch has been intimately involved with the making of over 60 major motion pictures, among them such films as "Source Code", "Fracture", "Primal Fear", "Marathon Man," "Chinatown," "Wayne's World," "Peggy Sue Got Married," "The Idolmaker," "Heaven Can Wait," "The Way We Were" and "Rosemary's Baby." Mr. Koch continues to develop and produce movies. Mr. Koch has over 51 years of experience in the motion picture industry and provides our

Board with a unique insight into the production of movies that are exhibited on our screens.

**Defendant Locke**

47.     Defendant Gary F. Locke ("Locke") has served as a Company director since February 2016. According to the 2017 Proxy Statement, as of February 28, 2017, Defendant Locke beneficially owned 4,302 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2017 was $31.35, Locke owned over $134,860 worth of AMC stock.

48.     For the fiscal year ended December 31, 2016, Defendant Locke received $145,725 in compensation from the Company. This included $48,715 in fees earned or paid in cash, and $97,010 in stock awards.

49.     The Company's 2017 Proxy Statement stated the following about Defendant Locke:

> *Mr. Gary F. Locke, 67*, has served as a director of the Company since February 2016. Mr. Locke is currently a trade consultant and owner of Locke Global Strategies, LLC since 2014. Mr. Locke was the first Chinese American to be elected as a U.S. Governor when the voters of Washington elected him in 1996 and re-elected him in 2000. During his administration he strengthened economic ties between China and Washington State. Mr. Locke then served as U.S. Commerce Secretary from 2009-2011, where he led the effort to implement President Obama's National Export Initiative to double American exports in five years. He then became America's 10th Ambassador to China, serving from 2011-2014, and during his service he opened markets for made-in-USA goods and services and reduced wait times for visa interviews of Chinese applicants from 100 days to three days. Mr. Locke is a member of the board of directors of Fortinet, Inc. He attended Yale University, graduating with a Bachelor degree in political science and received his law degree from Boston University. Mr. Locke brings to the Board a global and valuable business perspective due to his extensive role in politics and experience as an Ambassador to China.

### Defendant Pawlus

50.     Defendant Kathleen M. Pawlus ("Pawlus") has served as a Company director since December 2014. She also serves as Chair of the Audit Committee. According to the 2017 Proxy Statement, as of February 28, 2017, Defendant Pawlus beneficially owned 8,255 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2017 was $31.35, Pawlus owned over $258,790 worth of AMC stock.

51.     For the fiscal year ended December 31, 2016, Defendant Pawlus received $163,704 in compensation from the Company. This included $65,000 in fees earned or paid in cash, and $98,704 in stock awards.

52.     The Company's 2017 Proxy Statement stated the following about Defendant Pawlus:

> *Ms. Kathleen M. Pawlus, 56*, has served as a director of the Company since December 2014. Ms. Pawlus, retired partner of Ernst and Young, LLP ("EY"), served as the Global Assurance Chief Financial Officer and Chief Operating Officer from 2012 to 2014. EY's Assurance practice is the largest of EY's four service lines and includes its Audit Practice, Fraud, Investigation and Dispute Services Practice, Climate Change and Sustainability Services Practice and its Financial Accounting Advisory Services Practice. Prior to this, from 2006 to 2012, Ms. Pawlus served as EY's Americas Chief Financial Officer, Global PBFA Function Leader and US Firm Chief Financial Officer responsible for finance, IT operations, treasury, purchasing and facilities. Ms. Pawlus served on EY's U.S. Executive Board from 2006 to 2012. Ms. Pawlus earned her bachelor of science degree from Indiana University and is a Certified Public Accountant. Ms. Pawlus brings to the Board extensive financial, accounting, operational and management experience in various capacities with more than 30 years of experience.

### Defendant Saich

53.     Defendant Anthony J. Saich ("Saich") has served as a Company director since August 2012. He also serves as a member of the Audit Committee. According to the 2017 Proxy Statement, as of February 28, 2017, Defendant Saich beneficially owned 4,090 shares of the

Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2017 was $31.35, Saich owned over $128,220 worth of AMC stock.

54.     For the fiscal year ended December 31, 2016, Defendant Saich received $163,704 in compensation from the Company. This included $65,000 in fees earned or paid in cash, and $98,704 in stock awards.

55.     The Company's 2017 Proxy Statement stated the following about Defendant Saich:

*Mr. Anthony J. Saich*, *63*, has served as a director of the Company since August 2012. Since July, 2008, Mr. Saich has served as the Director of the Ash Center for Democratic Governance and Innovation and Daewoo Professor of International Affairs at Harvard University. In his capacity as Ash Center Director, Mr. Saich also serves as the director of the Rajawali Foundation Institute for Asia and the faculty chair of the China Public Policy Program, the Asia Energy Leaders Program and the Leadership Transformation in Indonesia Program. Mr. Saich also serves as the Chairman of the Board of Trustees of the China Medical Board and International Bridges to Justice and is the U.S. Secretary-General of the China United States Strategic Philanthropy. Mr. Saich sits on the executive committees of the John King Fairbank Center for Chinese Studies and the Asia Center, both at Harvard University, and serves as the Harvard representative of the Kennedy Memorial Trust. Mr. Saich holds a bachelor's degree in politics and geography from the University of Newcastle, United Kingdom, a master's degree in politics with special reference to China from the School of Oriental and African Studies, London University, and has a Ph.D. from the Faculty of Letters, University of Leiden, the Netherlands. Mr. Saich has over 35 years of experience in international affairs and will provide valuable international insights to the Company.

**Defendant Zeng**

56.     Defendant Maojun Zeng ("Zeng") has served as a Company director since February 2016 and as non-executive Chairman since March 14, 2018. Defendant Zeng is an employee of Wanda, parent of Wanda American Investment Holding Co. Ltd., which holds 100% of AMC's Class B shares, representing approximately 80% of the total voting power as of the issuance of the 2017 proxy statement.

57.     The Company's 2017 Proxy Statement stated the following about Defendant Zeng:

*Mr. Maojun (John) Zeng, 45*, has served as a director of the Company since February 2016. Mr. Zeng has been President of Wanda Cinema Line Co., Ltd, a subsidiary of Wanda group since March 27, 2014, and has served as a member of its Board of Directors since July 30, 2013. Mr. Zeng previously served as the Assistant to the President of Wanda Cultural Industries Group and Vice President of Wanda Cinema Line Corporation since February 28, 2012. Mr. Zeng holds an undergraduate degree and a master's degree in business administration from Renmin University of China. Mr. Zeng has experience serving in an executive leadership role at a major theatrical exhibition company in China and brings to the Board valuable theatrical exhibition knowledge.

### **Defendant Zhang**

58.     Defendant Lin Zhang ("Zhang") served as a Company director and Chairman of the Board from August 2012 to March 12, 2018, at which date he resigned. Defendant Zhang is an employee of Wanda, parent of Wanda American Investment Holding Co. Ltd., which holds 100% of AMC's Class B shares, representing approximately 80% of the total voting power as of the issuance of the 2017 proxy statement.

59.     The Company's 2017 Proxy Statement stated the following about Defendant Zhang:

*Mr. Lin (Lincoln) Zhang, 44*, has served as Chairman and a director of the Company since August 2012. Mr. Zhang has served as President of Wanda Cultural Industry Group since 2012. Mr. Zhang has served on the board of directors of Wanda Cinemaline Corporation since November 2006, Dalian Wanda Commercial Properties Co., Limited since December 2009, and Dalian Wanda Group Co., Limited since February 2011. Mr. Zhang also currently serves on the board of directors of Infront Sports & Media AG, Atletico De Madrid, and World Triathlon Corporation since 2015. Prior thereto, Mr. Zhang served as Vice President of Dalian Wanda Group Co., Limited from December 2009 to December 2012. Mr. Zhang received an M.B.A. from Beijing University and a bachelor's degree in accounting from Dongbei University of Finance and Economics. Mr. Zhang is a non-practicing member of the Chinese Institute of Certified Public Accountants and a non-practicing member of the China Certified Tax Agents Association. Mr. Zhang has over 16 years of experience in financial management and operation management of large companies, especially in corporate strategy and investment, which makes him well-positioned to serve as a director for the Company.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

60.     By reason of their positions as officers and/or directors of AMC and because of their ability to control the business and corporate affairs of AMC, the Individual Defendants owed AMC and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage AMC in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of AMC and its shareholders so as to benefit all shareholders equally.

61.     Each director and officer of the Company owes to AMC and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

62.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of AMC, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

63.     To discharge their duties, the officers and directors of AMC were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

64.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of AMC, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised AMC's Board at all relevant times.

65.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

66.    To discharge their duties, the officers and directors of AMC were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of AMC were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Kansas, and the United States, and pursuant to AMC's own Code of Business Conduct and Ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how AMC conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of AMC and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that AMC's operations would comply with all applicable laws and AMC's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

67.    Each of the Individual Defendants further owed to AMC and the shareholders the duty of loyalty requiring that each favor AMC's interest and that of its shareholders over their own

while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

68.     At all times relevant hereto, the Individual Defendants were the agents of each other and of AMC and were at all times acting within the course and scope of such agency.

69.     Because of their advisory, executive, managerial, and directorial positions with AMC, each of the Individual Defendants had access to adverse, non-public information about the Company.

70.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by AMC.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

71.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

72.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

73.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material

facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of AMC was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

74.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

75.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of AMC, and was at all times acting within the course and scope of such agency.

## AMC'S CODE OF ETHICS

76.     Pursuant to the Company's Code of Business Conduct and Ethics (the "Code of Ethics"), the Code "is applicable to all of our directors, officers, including designated officers, and other associates . . . and provides a general statement of our expectations regarding ethical standards to which such persons are expected to adhere."

77.     The Code of Ethics provides, as to "Accurate and Timely Periodic Reports," that:

[W]e expect our designated officers and others responsible for such matters to conduct themselves in such a way that we will:

• comply with generally accepted accounting principles at all times;

- maintain a system of internal accounting controls that will provide reasonable assurances to management that all transactions are properly recorded;
- maintain books and records that accurately and fairly reflect our transactions;
                            * * *
- maintain a system of disclosure controls and procedures that will provide reasonable assurances to management that material information about us is made known to management, particularly during the periods in which our periodic reports are being prepared; and
- present information in our periodic reports and other public communications in a full, fair, accurate, timely, clear and understandable manner.

78.    The Code of Ethics provides, as to "Internal Financial Controls and Reports," that:

Accounting control standards and procedures exist to ensure that our assets are protected and properly used and our financial reports and records are accurate and reliable. The accuracy of these reports depends upon the accuracy of the information provided. All documents supporting the financial records should be accurate and should reflect the true nature of the transaction. You should not falsify or otherwise provide information that is not accurate or complete in connection with any Company form or record.

79.    The Code of Ethics provides, as to "Public Communications," that "[w]e are committed to providing full, fair and accurate disclosure in all public communications and in compliance with all applicable law, regulations and rules."

80.    The Code of Ethics provides, as to "Reporting Concerns," that:

Any known or suspected violation of this Code of Ethics should be reported promptly to your supervisor, the Company's Compliance Director or the Company's General Counsel. In this regard, failure to report any violation and impeding an investigation will be deemed a violation of this Code of Ethics.

81.    In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply

with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

82.     Following the recent acquisitions of several other theater chains in the U.S. and Europe, AMC owns and operates the world's largest chain of movie theaters.

83.     In addition to traditional film programming, AMC offers customers a range of entertainment experiences. AMC offerings include independent and foreign films, music, sports, and performing arts, as well as food and beverage options ranging from snacks and sodas to alcohol and dine-in options.

84.     Box office admissions constitute the Company's largest source of revenue, followed by food and beverage sales. AMC earns additional income from its loyalty program, AMC Stubs, theater rentals, gift cards, and on-line ticketing fees.

85.     AMC Stubs provides numerous benefits to members, including discounts and members-only offerings and services. AMC had 5.2 million active member households enrolled in Stubs as of December 31, 2016. The Company's 2016 10-K stated that the Stubs program is designed to strengthen guest loyalty, attract new guests, and drive return visits.

#### *Acquisitions*

86.     In 2016 and early 2017, AMC acquired several other theater chains in the U.S. and Europe.

87.     AMC and Carmike announced on March 3, 2016 that the firms had entered into a definitive merger agreement. The agreement established that AMC would acquire all outstanding shares of Carmike for $30.00 per share, cash. This deal valued Carmike at approximately $757 million. AMC agreed to enter into a debt financing commitment letter to fund the acquisition.

88.     On December 20, 2016, prior to the SPO discussed further herein, AMC held a conference call with analysts and investors to discuss the Company's acquisition of Carmike (the "Carmike Conference Call"). On the Carmike Conference Call, Defendant Aron told investors that, by December 20, 2016, AMC had had "plenty of time to look at . . . Carmike" and understand and analyze its operations, including, among other things, the customer visitation-related data associated with the Carmike theaters.

89.     The Carmike acquisition was completed on December 21, 2016 for $858.2 million, comprised of $584.3 million in cash and $273.9 million in common stock. AMC assumed $230 million in debt to finance the acquisition.

90.     As of December 21, 2016, Carmike operated 271 theaters across 41 U.S. states, with a total of 2,923 screens. According to AMC's SEC filings, Carmike is a nation-wide leader in digital cinema, 3-D cinema, and alternative programming.

91.     In order to obtain regulatory approval for the merger, AMC agreed with the U.S. Department of Justice to, *inter alia*, divest ownership of 17 AMC theaters in markets where AMC and Carmike's business overlapped.

92.     AMC completed the acquisition of all outstanding equity of Odeon and UCI Cinema Holdings, Ltd. ("Odeon") on November 30, 2016. As of that date, Odeon operated 242 theaters in Western Europe.[2]

93.     The Odeon acquisition cost AMC $637 million, $480.3 million of which was cash and $156.7 million of which was paid in stock. AMC also paid $593.2 million of Odeon's outstanding debt.

---

[2] Specifically, Odeon operated theaters in the U.K., Spain, Germany, Italy, Austria, Portugal and Ireland.

94.     AMC announced an agreement to acquire Nordic Cinema Group Holding AB ("Nordic") in an all cash transaction valued at $929 million on January 23, 2017. Stockholm-based Nordic was the largest theater exhibitor in seven nations across Scandinavia and the Nordic and Baltic regions.

95.     Unlike the domestic movie market, which tends to see higher attendance in the summer months, European theaters tend to see lower attendance during summer months.

96.     In order to finance these acquisitions, AMC took on various forms of debt. For the Carmike transaction, AMC entered into a bridge loan agreement for $350 million with affiliates of Barclays, Citigroup, Credit Suisse, Merrill Lynch, and HSBC Securities (USA) Inc. Each of these lenders were underwriters in the Company's SPO, and the agreements required more than $30 million of proceeds from the SPO to be used to pay down the bridge loan.

97.     On March 10, 2017, the Company announced that:

> it intends to offer, subject to market and other conditions, $475 million in aggregate principal amount of dollar-denominated senior subordinated notes due 2027 . . . and an additional £250 million aggregate principal amount of sterling-denominated 6.375% Senior Subordinated Notes due 2024 . . . in a private offering that is exempt from the registration requirements of the Securities Act . . . .

The press release noted that the Company intended to use the proceedings of the offering to finance the Nordic acquisition, "pay related fees and expenses and to use any remaining proceeds for general corporate purposes."

98.     On April 19, 2017, the Company filed with the SEC a registration statement on Form S-4, which offered to exchange: (1) all of the Company's new 6.375% Senior Subordinated Notes due 2024 for all of its outstanding 6.375% Senior Subordinated Notes due 2024; (2) all of the Company's new 5.875% Senior Subordinated Notes due 2026 for all of its outstanding 5.875% Senior Subordinated Notes due 2026; and (3) all of AMC's new 6.125% Senior Subordinated Notes due 2027 for all of its outstanding 6.125% Senior Subordinated notes due 2027.

*The SPO*

99.      On December 21, 2016, the Company filed a shelf registration statement on Form S-3 with the SEC. The purpose of this filing was to permit AMC and its selling stockholders to offer or sell, from time to time, AMC shares in a secondary public offering.

100.      On February 9, 2017, AMC filed a prospectus with the SEC (the "Prospectus" and, collectively with the Form S-3, the "Registration Statement"). The Prospectus offered to register 21,904,761 common shares[3] in the SPO for $31.50 per share.

101.      AMC sold 20,330,874 common shares in the SPO, realizing net proceeds of approximately $618 million.[4]

*Registration Statement Requirements*

102.      Instruction 11(a) of Form S-3 requires an issuer to disclose "***any and all material changes in the registrant's affairs*** which have occurred since the end of the latest fiscal year for which certified financial statements were included in the latest annual report to security holders and which have not been described in a report on Form 10-Q . . . or Form 8-K . . . filed under the Exchange Act."

103.      Regulation S-K requires, as noted in the instructions to Item 303(a), that the Registration statement disclose and "focus specifically" on material events and uncertainties that would cause the historical financial information about the Company not to be necessarily indicative of future operating results. This includes "matters that would have an impact on future operations and [matters that] have not had an impact in the past." The instructions state, in relevant part:

> The discussion and analysis shall ***focus specifically on material events and uncertainties known to management that would cause reported financial***

---

[3] This figure included 2,857,142 shares pursuant to an overallotment option issued to the underwriters.
[4] Emphasis added.

*information not to be necessarily indicative of future operating results* or of future financial condition. ***This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past***, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.[5]

104.     The SEC issued an interpretive release to Item 303 of Regulation S-K on May 18, 1989 (the "1989 Interpretive Release"). The 1989 Interpretive Release clarifies that there is a duty to disclose where a demand, trend, commitment, uncertainty or event is both presently known to management and reasonably likely to have a material effect on either the registrant's financial condition or results of operation. The 1989 Interpretive release states, in relevant part:

Item 303(a)(2)(i) requires a description of the registrant's material "commitments" for capital expenditures as of the end of the latest fiscal period. However, even where no legal commitments, contractual or otherwise, have been made, ***disclosure is required if material planned capital expenditures result from a known demand, as where the expenditures are necessary to a continuation of the registrant's current growth trend***. Similarly, if the same registrant determines not to incur such expenditures, a known uncertainty would exist regarding continuation of the current growth trend. If the adverse effect on the registrant from discontinuation of the growth trend is reasonably likely to be material, disclosure is required. ***Disclosure of planned material expenditures is also required, for example, when such expenditures are necessary to support a new, publicly announced product or line of business***.

* * *

Events that have already occurred or are anticipated often give rise to known uncertainties. For example, a registrant may know that a material government contract is about to expire. The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed. ***More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant***, or may have been advised by the government that the contract may not be renewed. ***The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant. In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required***.[6]

---

[5] Emphasis added.
[6] *Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures*, Release Nos. 33-6835 and 34-26831, 1989 SEC LEXIS 1011, at *15, *18 (May 18, 1989) (Emphasis added, footnote omitted).

105.    On December 19, 2003, the SEC issued an interpretive release to Item 303 of Regulation S-K (the "2003 Interpretive Release"). The 2003 Interpretive Release established that the Registration Statement was required to disclose known demands, events, or uncertainties, except for those that management determined: (1) were not reasonably likely to occur; or (2) would not have a material effect on the Company's operating results. The 2003 Interpretive Release states, in pertinent part;

> As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty is required unless a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.[7]

**False and Misleading Statements**

*Carmike Press Release & Conference Call*

106.    On December 20, 2016, the Company issued a press release that announced that regulatory approval had been obtained for the Carmike acquisition (the "Carmike Press Release"). AMC also held a related conference call (the "Carmike Conference Call") with analysts and investors later that same day to discuss the Carmike acquisition.

107.    Defendant Aron began the Carmike Conference Call by announcing that, "[i]n total, we are as confident today as we were back in March [2016] when this transaction was first announced, that the growth potential for AMC is enhanced by joining forces with Carmike Cinemas."

108.    Defendant Aron assured investors that AMC had become thoroughly familiar with the operations of both Carmike and Odeon, stating:

> On November 30, we completed the acquisition of Odeon [and] UCI Cinemas Group, since renamed Odeon[,] and our teams have already been on the ground

---

[7] *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, Release Nos. 33-8350 and 34-48960, 2003 SEC LEXIS 3034, at *36 (Dec. 19, 2003) (footnote omitted).

since day one in Europe working with our colleagues at Odeon to integrate the UK and Europe's largest movie exhibition circuit into the growing world of AMC.

109.    On the Carmike Conference Call, Defendant Aron told investors that, by December 20, 2016, AMC had had "plenty of time to look at . . . Carmike" and understand and analyze its operations, including, among other things, the customer visitation-related data associated with the Carmike theaters. During the call, the following exchange took place:

> [Eric Handler, Analyst, MKM Partners:] Thanks for taking my question. Two questions for you guys. ***First, with regards to Carmike, now you've had quite a bit of time to go through the Company's books and access their assets***. I'm just curious how fast do you think you can move in terms of doing some renovations and reseats at the circuit and ***what have you found from kicking the tires on the assets over the past, what's nearly a year now***? . . .

> [Defendant Aron:] Eric. I will take two of your three and Craig will take the third. In terms of what we've learned over the year, the blessing of – we announced the transaction in March. It's now December. ***So we've had plenty of time to look at the Carmike circuit and to plan for the integration*** . . .

> In terms of what we've learned, ***we've learned that***, for all of our talk, including in my prepared remarks about – ***[AMC is] in big markets and [Carmike is] in small markets*** and actually there is a big chunk of theaters that overlap and so what we've decided to do is proceed with what we are calling a two-brand strategy, three brands if you count the dine-in theaters as its own sub-brand. ***You have some theaters that will be branded and taken to the public as AMC and other theaters that have less visitation that might have slightly lower service standards, branded*** as a second brand, but what we found is that there are plenty of Carmike theaters that are substantial enough in their visitation or locales to graduate, so to speak, into the AMC brand. And there are a lot of AMC theaters that also have lower visitation levels that we think are more like a Carmike theater than like an AMC theater. ***So I would expect*** that in excess of 50 current AMC theaters will move into the second brand and ***in excess of 100 [of the 271] Carmike theaters will move into the AMC brand***. Now, just because they are different brands doesn't mean that guest satisfaction will be lower in brand 2 than brand 1. It just means that we will offer different levels of service, amenities and price points and better marry consumer expectations to the reality of what's being offered.
> So, I think that's what we've learned . . . .[8]

---

[8] Emphasis added.

110.    Concerning the loyalty program, Defendant Aron stated, in pertinent part, that the combination of AMC and Carmike was "expected to broaden our appeal with moviegoers with more people having access to the AMC Stubs loyalty program."[9]

### The Registration Statement

111.    The version of the Company's Registration Statement, filed December 21, 2016, which was declared effective by the SEC contained a number of false and misleading statements regarding the Company, its management, operations, financial performance, growth prospects, and the relevant market. The Registration Statement was signed by Defendants Aron, Ramsey, Cox, Zhang, Gao, Zeng, Saich, Hill, Locke, Koch and Pawlus.

112.    The Registration Statement incorporated by reference a number of documents, including Carmike's Form 10-Q for the quarter ended September 30, 2016 (the "Q3 2016 Carmike 10-Q").

113.    The Q3 2016 Carmike 10-Q contained false and misleading statements regarding Carmike's revenue growth over the first three quarters of 2017. The Registration Statement stated, in relevant part:

*Revenues.* We collect substantially all of our revenues from the sale of admission tickets and concessions. The table below provides a comparative summary of the operating data for this revenue generation.

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| Average theatres | 272 | 269 | 274 | 271 |
| Average screens | 2,928 | 2,875 | 2,940 | 2,885 |
| Average attendance per screen | 5,898 | 5,320 | 16,624 | 16,859 |
| Average admission per patron | $ 7.30 | $ 7.23 | $ 7.59 | $ 7.36 |
| Average concessions and other sales per patron | $ 4.85 | $ 4.55 | $ 5.11 | $ 4.68 |
| Total attendance (in thousands) | 17,269 | 15,294 | 48,874 | 48,475 |
| Total operating revenues (in thousands) | $ 209,730 | $ 180,241 | $ 620,592 | $583,674 |

---

[9] Emphasis added.

114.    The Q3 2016 Carmike 10-Q continued, discussing operating revenues generally:

Total operating revenues increased 16.4% to $209.7 million for the three months ended September 30, 2016 compared to $180.2 million for the three months ended September 30, 2015, due to an increase in total attendance from 15.3 million in the third quarter of 2015 to 17.3 million in the third quarter of 2016, an increase in average admissions per patron from $7.23 in the third quarter of 2015 to $7.30 in the third quarter of 2016 and an increase in average concessions and other sales per patron from $4.55 in the third quarter of 2015 to $4.85 in the third quarter of 2016. Excluding operating revenues from the acquired Sundance theatres which totaled $5.8 million, total operating revenues increased 13.1% to $203.9 million. The increase in total revenues, excluding the acquired Sundance theatres, was due to an increase in attendance from 15.3 million in the third quarter of 2015 to 17.0 million in the third quarter of 2016, an increase in average admissions per patron from $7.23 to $7.24 and an increase in average concessions and other sales per patron from $4.55 to $4.77. The increase in average admissions per patron for the third quarter of 2016 was due to the adoption of a tax on top pricing policy in the fourth quarter of 2015, the acquired Sundance theatres and revenues related to unredeemed gift cards, partially offset by summer promotional activities introduced in 2016. Average concessions and other sales per patron increased primarily due to concession promotions, expanded food and beverage menus at certain theatres, including our in-theatre dining locations, the adoption of a tax on top pricing policy in the fourth quarter of 2015 and revenues related to unredeemed gift cards.

115.    The Q3 2016 Carmike 10-Q proceeded to address admissions revenue:

Admissions revenue increased 13.9% from $110.6 million for the three months ended September 30, 2015 to $126.0 million for the three months ended September 30, 2016, due to an increase in total attendance from 15.3 million in the third quarter of 2015 to 17.3 million in the third quarter of 2016, an increase in average admissions per patron from $7.23 in the third quarter of 2015 to $7.30 for the third quarter of 2016, and revenues related to unredeemed gift cards. Excluding admissions revenue from the acquired Sundance theatres of $3.1 million, admissions revenue increased 11.1% from $110.6 million for the three months ended September 30, 2015 to $122.9 million for the three months ended September 30, 2016.

116.    Finally, the Q3 2016 Carmike 10-Q addressed concessions revenue:

Further, Concessions and other revenue increased 20.3% to $83.7 million for the three months ended September 30, 2016 compared to $69.6 million for the same period in 2015 due to an increase in total attendance from 15.3 million for the three months ended September 30, 2015 to 17.3 million for the three months ended September 30, 2016, and an increase in average concessions and other sales per patron from $4.55 in the third quarter of 2015 to $4.85 in the third quarter of 2016, the adoption of a tax on top pricing policy in the fourth quarter of 2015

and revenues related to unredeemed gift cards. Excluding concessions and other revenues from the acquired Sundance theatres of $2.7 million, concessions and other revenue increased 16.4% from $69.6 million for the three months ended September 30, 2015 to $81.0 million for the three months ended September 30, 2016.

117.    The above-noted statements were materially inaccurate because the Registration Statement failed to disclose that Carmike had been experiencing a significant loss in market share during the first nine months of 2016 that was then having a material and on-going adverse effect on its operating performance.

118.    Further, the Registration Statement incorporated by reference AMC's Form 10-K for the fiscal year ended December 31, 2015 filed with the SEC on March 8, 2016 (the "2015 10-K"). Regarding the seasonality of AMC's business, the 2015 10-K stated:

> Our revenues are dependent upon the timing of motion picture releases by distributors. The most marketable motion pictures are usually released during the summer and the year-end holiday seasons. Therefore, ***our business is highly seasonal, with higher attendance and revenues generally occurring during the summer months and holiday seasons.*** Our results of operations may vary significantly from quarter to quarter.[10]

119.    As noted above, movie attendance, and theater revenues, tend to drop in Europe during the summer months. As a result, the statement regarding seasonality incorporated by reference into the Registration Statement was materially false and misleading. Instruction 11(a) of Form S-3 requires that a Registration Statement be updated to disclose "any and all material changes" in a Company's affairs. In this instance, the fact that summer attendance is generally lower in the Company's newly acquired European theaters should have been disclosed.

120.    Further, the Registration Statement failed to disclose that gross margins on food and beverage sales, AMC's second highest source of revenue, were and are materially lower for the Company's newly acquired international business than had been historically reported for

---

[10] Emphasis added.

domestic operations. For its international operations, food and beverage costs as a percentage of revenue are approximately 50% greater than for domestic operations.

### The Prospectus

121.    On February 9, 2017 the Company filed the Prospectus, which contained substantially the same information presented in the Registration Statement. Therefore, the Prospectus was false and misleading in the same ways, and for the same reasons, as the Registration Statement.

### Nordic Press Release and Conference Call

122.    The Company issued a press release on January 23, 2017 announcing that it had entered into a definitive agreement to acquire Nordic, which was the largest theater exhibitor in seven Northern European countries (the "Nordic Press Release"). The Nordic Press Release noted that Nordic operated 68 theaters and had a substantial minority interest in another 50 associated theaters. Following the Nordic acquisition, AMC's domestic operations accounted for 70% of its total attendance, screens and revenue, with Odeon and Nordic accounting for the remaining 30%.

123.    On January 23, 2017, the Company held a conference call with analysts and investors to discuss the Nordic acquisition (the "Nordic Conference Call"). During the Nordic Conference Call, Defendant Aron described the integration of Carmike and Odeon as "flawless," stating, in relevant part:

> So far, vis-a-vis *Carmike and Odeon, our efforts as best we can tell, surrounding integration planning and integration execution have been flawless*. We fully expect this also will be the case on our third go-round in one year. With some practice, *we're getting pretty good at putting companies together*, and of course everyone knows the old saying, about how you get to Carnegie Hall.[11]

---

[11] Emphasis added.

124.   Defendant Aron further asserted that the Company's foreign acquisitions would be completed in time for AMC to benefit from a "busy summer film slate," stating:

> Like in our Odeon transaction, European Commission approval will be required for closing, but as we've had recent experience with [the] EU, and as we have no theaters in these seven Northern European countries presently, we believe that securing EU approval should be both painless and quick. ***We expect closing to happen well within the first half of 2017, and ahead of the busy summer film slate.***[12]

However, Defendant Aron did not disclose that such benefits would be offset by seasonal factors, or that the seasonality of movie attendance in Europe was not comparable to that in the U.S.

### February 2017 Press Release and Conference Call

125.   The Company issued a press release on February 28, 2017 announcing financial results for the quarter and year ended December 31, 2016. The press release noted that AMC had a record-setting fourth quarter and year across all revenue categories. Further, the press release asserted that the SPO proceeds would be used to pay for the Company's recent acquisitions. The press release stated, in relevant part:

> In connection with the acquisitions of Odeon/UCI and Carmike, and the planned acquisition of Nordic, in February 2017 AMC raised more than $640 million of additional equity through the sale of 20,330,874 shares of the Company's Class A common stock, par value $0.01 per share, at $31.50 per share.
>
> The net proceeds of the offering were approximately $618.0 million after deducting underwriting commissions and before deducting estimated offering expenses. ***AMC used the net proceeds from this offering to repay $350 million principal amount of outstanding bridge loans incurred in connection with its completed acquisition of Carmike Cinemas, Inc. and intends to use the remaining proceeds to finance a portion of the previously announced acquisition of Nordic.*** If the Nordic acquisition is not consummated, AMC will use the net proceeds from the offering for general corporate purposes.[13]

126.   Defendant Aron provided the following comments regarding the financial results:

---

[12] Emphasis added.
[13] Emphasis added.

AMC's laser-like focus on the priorities that drive considerable growth is what differentiates us, and what has established AMC as the clear and undisputed leader among movie-theatre operators . . . Our innovations with powered recliner seats, enhanced food and beverage initiatives and the expansion of premium large format offerings, combined with AMC's world class marketing efforts, has created industry defining guest experiences and engagement. In concert with a prudent and opportunistic acquisition strategy, 2016 resulted in the successful acquisition of Odeon, Europe's largest movie exhibitor, and Carmike Cinemas, the nation's then fourth largest domestic exhibitor, and presented AMC with the opportunity to acquire Nordic Cinema Group, announced in January of 2017. AMC has never been better positioned to leverage our proven strategic initiatives across a growing platform both here in the U.S. and across the globe.

127.    Later that same day, the Company held a conference call with analysts and investors to discuss the Company's earnings release and operations. During the call, Defendant Aron made the following statements regarding the seasonality of AMC's newly acquired international operations:

Internationally, for the year, the year being defined as November 30 to December 31, the time in which we owned Odeon, total revenues were in Europe were . . . $118.9 million, and adjusted EBITDA was $28.4 million.

Please keep in mind that this adjusted EBITDA in Europe is a result of **December** movies, **one of the busiest months of the year** and should not be extrapolated merely by multiplying by 12 for full-year 2017.[14]

128.    Defendant Aron further represented that the Company's integration of Carmike had "begun . . . in earnest," with AMC having identified "$35 million of cost synergies" associated with the Carmike acquisition, which were expected to be "substantially realized" over the following ten months. In relevant part, Defendant Aron stated:

Carmike offers AMC complementary markets in suburban and rural regions of the country, with little market overlap and gives AMC a truly national footprint.
We will deploy some of our strategic growth initiatives at every Carmike Theater and many will be renovated full-blown with recliner seating. **We have also identified $35 million of cost synergies, which we believe will be substantially realized by the end of 2017. We've already begun the integration in earnest**,

---

[14] Emphasis added.

converting point-of-sale systems and vendor contracts and commencing initiative deployments.[15]

129.    Regarding the Company's 2017 guidance, Defendant Aron noted that consensus revenue and earnings estimates set forth by securities analysts at that time "seem to be in the right ballpark." At the time, Wall Street analysts' consensus estimates were as follows:

| (totals do not add due to rounding) | Revenue (billions) | Earnings Per Share |
|---|---|---|
| Q1 2017 | $1.168 | $0.11 |
| Q2 2017 | $1.301 | $0.37 |
| Q3 2017 | $1.198 | $0.10 |
| Q4 2017 | $1.359 | $0.48 |
| FY 2017 | $5.044 | $1.04 |

130.    During the question and answer portion of the conference call, Defendant Aron announced that "you'll start to see Carmike cinemas getting renovated in 2018 but, that's probably a 2018, 2019, and – or 2018 and 2019, or 2018, 2019 and 2020 renovation plan."

*The 2016 10-K*

131.    On March 10, 2017, the Company filed its financial results for the quarter and year ended December 31, 2016 on Form 10-K with the SEC, which was signed by Defendants Aron, Ramsey, Cox, Zhang, Gao, Zeng, Saich, Hill, Locke, Koch and Pawlus (the "2016 10-K"). The 2016 10-K contained materially false and misleading disclosures regarding: (1) Carmike's operations; (2) the seasonality of the Company's foreign operations; (3) AMC's loyalty program; (4) management's discussion and analysis of financial conditions and results of operations; and (5) the Company's disclosure controls.

132.    Attached to the 2016 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Aron and Ramsey attesting to the accuracy of the 2016 10-K.

---

[15] Emphasis added.

### The 2017 Proxy Statement

133.   The Company's 2017 Proxy Statement states that the Company has "a Code of Business Conduct and Ethics that applies to all of our associates, including our principal executive officer, principal financial officer and principal accounting officer, or persons performing similar functions. These standards are designed to deter wrongdoing and to promote honest and ethical conduct."

134.   The 2017 Proxy statement was false and misleading because, despite assertions to the contrary, its Code of Ethics was not followed.

135.   The 2017 Proxy statement was also false and misleading because it failed to disclose that: (1) the operations of Carmike had been experiencing a prolonged period of financial underperformance due, in large part, to a protracted period of underinvestment in its theaters; (2) Carmike had experienced a significant loss in market share when its loyal patrons migrated to competitors that had renovated and upgraded their theaters; (3) AMC was able to retain only a very small number of Carmike's loyalty program members after the Carmike acquisition; (4) that the issues identified in (1)-(3) above were then having a material adverse effect on Carmike's operations and theater attendance and, in response, AMC planned to boost visitation levels at Carmike theaters by materially expanding promotional and capital investment spending activity, which was reasonably likely to have a material adverse effect on AMC's near term operating results; (5) the Company's representations about the seasonality of AMC's business were materially false and misleading; (6) the representations concerning Carmike's operations, the seasonality of its business, AMC's management's discussion and analysis of financial condition, and AMC's disclosure controls were materially false and misleading; (7) AMC failed to maintain adequate internal controls; and (8) that, as a result of the foregoing, the Company lacked a

reasonable basis for its positive statements about AMC's then-current business and future financial prospects, including their statements relating to AMC's financial guidance, as well as the cost synergies associated with the "flawless" integration of Carmike.

### April 19, 2017 Press Release

136.    The Company also issued a press release on April 19, 2017 "to facilitate greater transparency and clarity it is providing additional financial disclosure primarily related to its three recent acquisitions." In that press release, Defendant Aron commented:

> We remain committed to providing appropriate and relevant financial disclosure to our shareholders. We believe that with the complexity and close timing of the three transformative acquisitions we have successfully completed in the last five months, the additional disclosure we are providing today, beyond the pro forma financial information we have already published, will be helpful for investors . . . We continue to be excited about the earnings potential for AMC as we have grown to a network of approximately 1,000 theatres and 11,000 screens in 15 countries in the U.S. and Europe. As we deploy our proven growth initiatives across our system, we expect to unlock both near-term and long-term value, as evidenced already by the fact that, as of today we expect to exceed the current FACTSET consensus EBITDA estimate for the first quarter ended March 31, 2017. When appropriate and feasible, we expect to provide additional financial disclosure related to the acquisitions and their contributions for the balance of 2017

### Q1 2017 10-Q

137.    On May 8, 2017, the Company filed its financial results for the quarter ended March 31, 2017 on Form 10-Q with the SEC (the "Q1 2017 10-Q) which was signed by Defendants Aron and Ramsey. The Q1 2017 10-Q repeated the same false and misleading statements contained in the 2016 10-K.

138.    Attached to the 2017 Q1 10-Q were SOX certifications signed by Defendants Aron and Ramsey attesting to its accuracy.

### Q1 2017 10-Q Press Release and Conference Call

139.   On May 8, 2017, the Company issued a press release announcing its financial results for the quarter ended March 31, 2017, which highlighted the Company's record setting results for the quarter in all revenue categories. Defendant Aron commented, in relevant part:

> *AMC is off to a tremendous and record start in 2017*. AMC's ability to purposefully act on the opportunities and innovations that drive growth continues to set us apart and further solidifies our leadership position among movie-theatre operators in the U.S. and Europe . . . Achieving record *first quarter 2017 Adjusted EBITDA of $251.3 million is tangible evidence of what we have been saying for the better part of a year, that the earnings power of this new incarnation of a larger and more influential AMC is enormous compared to other operators and even to our own recent past*.[16]

140.   Defendant Aron continued, highlighting important developments in Q1 2017:

> We would particularly point out three important developments at AMC so far this year. First, at the legacy pre-acquisition AMC theatres, we grew revenues at a meaningfully faster pace than the industry at large, due in part to our commitment to renovating theatres and the strength of our impactful marketing programs. Second, with our domestic acquisition, *our rapid move to achieve cost synergies and efficiencies brought immediate bottom line benefit, offsetting revenue weakness that had been prevalent at Carmike for eight of the twelve months and three of the last four months of 2016. We are directly focused on improving revenues at the acquired domestic theatres, as well as furthering the cost reduction efforts that already are well in hand*. And third, we are thrilled both by our brisk start in driving immediate revenue and earnings growth in constant currency in Europe, and the likelihood that our plans to drive even more earnings through renovation of European theatres will come to initial fruition in quantity as early as the end of 2018.[17]

141.   Defendant Aron concluded by noting that he expected further growth:

> *We are only just beginning to unlock the growth potential of our recent acquisitions. The initial integration efforts of creating a transformed AMC have been done quickly and have been very smooth. As we now move to make what we expect will be highly lucrative investments in guest-facing initiatives like powered recliner seats, enhanced food and beverage offerings and the expansion of premium large format experiences, we are as confident as we could be in the future earnings potential of AMC*. We remain optimistic about the opportunity to

---

[16] Emphasis added.
[17] Emphasis added.

continue to deliver meaningful value to our shareholders both in the balance of 2017 and in the years ahead.[18]

142.     The Company held a conference call later that same day to discuss the Q1 2017

financial results. During the call, Defendant Aron noted the increased customer participation in the

Company's loyalty program, stating:

> And speaking of the efficacy of those marketing programs, ***AMC Stubs*** . . . ***participation continues to soar***. As of today, we have 7,553,209 AMC Stubs member households. We previously announced hitting 5 million member households on December 19 of last year; announced 6 million member households on February 13 of this year; and 7 million member households on April 13, less than a month ago. ***So in a year, we've tripled the Stubs membership to numbers that we believe are light-years ahead of any other exhibitor program and the numbers continue to grow rapidly***.
>
> * * *
>
> As previously mentioned, our rapidly growing number of AMC Stubs members accounted for approximately 25% of all ticket sales in Q1, and will soon account for more than 30% of all AMC moviegoers in the United States. These tens of millions of purchase histories now captured in our database offer us a treasure trove of data and consumer information for us to use to market AMC and future moviegoing more effectively.[19]

143.     Defendant Aron then touted the success of the Carmike integration, stating, in

relevant part:

> ***The integration of Carmike into AMC is running very smoothly***. As you know, we are retiring the Carmike name and are rebranding all our theaters as AMC, about 400 of the 644; or AMC Dine-In, about 45 of the 644; or AMC Classic, about 200 of the remaining theater locations in the U.S. However, as our AMC and AMC Dine-In Theaters are considerably larger and get considerably more visitation, only about 10% of our revenues will fall under the AMC Classic marquee.
>
> ***We have made great progress with the conversion of the acquired theaters***. We only have 2 Carmike theaters as we speak, and by the end of this week, all Carmike theaters will have gone through their cutover to AMC systems, processes and brands. ***There have literally been no operational snafus of any note to report*** to you, and the new larger AMC is showing movies every day without pain in a much bigger national footprint.[20]

---

[18] Emphasis added.
[19] Emphasis added.
[20] Emphasis added.

144.     Defendant Aron acknowledged some "revenue weakness" experienced by Carmike during 2016, but assured investors that AMC expected that the "short-term revenue softness" would "reverse soon":

> **[W]ith Carmike, we have inherited a circuit that was showing revenue weakness in** 8 of the 12 months in 2016 and in 3 of the 4 months in the last trimester of **2016**. Candidly, that was one of the allures to us of acquiring Carmike. As we look to the end of 2017 and into 2018, we are highly confident that AMC's marketing activity and product ideas will generate a meaningful revenue boost to the Carmike theaters just newly added to our domestic platform.
>
> Fortunately, we **were so aggressive in reducing expense and in achieving expense synergies that the cost savings are offsetting short-term revenue softness** – again, which I'm quick to add, we expect to reverse soon on our watch.[21]

145.     In response to an analyst's question regarding Carmike's revenue softness and the Company's ability to manage it, Defendant Aron stated:

> With respect to the Carmike theaters, **when I talk about revenue softness**, I'm not talking about revenue declines. What **I'm talking about is that the AMC Theatres have been growing faster than the Carmike theaters have been growing**, if you take, though, the totality of it all. So no, we're – there's no thought to shuttering any Carmike theaters.
>
> We think we have an A team in place here in Kansas City that has generated great results for AMC over the past year. That's why AMC revenues are up 6.2% when the industry is up 4%, 5%. That same team is now wholly focused on the Carmike theaters, not only from a system basis but also theater-by-theater. And we're highly confident we're going to make a lot of progress across the Carmike system.
>
> * * *
>
> And so – but it took Carmike a year to get into this position. We said that their revenue softness was 8 months out of 12, so we're not going to get out of it in a week. But I think, as we look to the second half of '17, as we look certainly to '18, we'll start to see the Carmike theaters perform in a really good way. And as I said, something on the order of 2/3 of the incremental dollar drops down to the bottom line.[22]

146.     Near the end of the call, Defendant Aron opined on the success of Carmike theaters since the acquisition:

---

[21] Emphasis added.
[22] Emphasis added.

On the issue of Carmike, I – it's really complicated. There are a *lot of Carmike theaters that are doing just great. So we've gotten quite granular looking theater by theater by theater*, and there are so many reasons. And I want to be careful what I say because I don't want to say anything uncharitable to the prior management team. It's a problem that we inherited. It's a problem that we'll solve.[23]

147.    Defendant Aron continued, exploring reasons why Carmike theaters were not

growing as fast as AMC legacy theaters:

You could imagine, with any company that announced it was for sale in March and got sold in December, that decisions that might have been taken to drive short-term performance might have been put on hold, thinking those are more appropriate decisions that should be taken by the new owner. That's one argument.

Another argument is some of the Carmike theaters did have competitive activity around them. And they – since Carmike was not a company that really believed in recliner reseats, they didn't counter some of that competitive activity by putting in re-seated theaters of their own. Clearly, that's something that will change.

When we have a theater that we renovate, we do it in 3 to 6 months. *Two of the largest theaters in their system, they shut down for renovation*, and I believe they're going to be closed for 15 months – which, again, I know it's only 2 theaters out of 270, but when they're significant theaters of size and when you're starting to look at all these things on 0.10% here and 1% over there, *it matters*.

There's a lot more than that. We've already taken 5 of their theaters. For example, that they had as sub-run theaters, meaning they're showing older films, and we've already converted those – at a very deeply discounted price. We've already converted those theaters to first-run movie houses, showing the latest Hollywood releases at full price.

So there are a lot of reasons there – for as many of their theaters, there are sort of reasons that affect big patches of their theaters, and we think we have a solid understanding of what the issues have been, theater by theater, and we're putting in solutions, theater by theater.[24]

148.    Defendant Aron concluded by noting his optimism about Carmike's prospects:

The Carmike theaters in question have only been branded as AMC theaters in the last 30, 60, 90 days. The first cut-over was mid-January, and the last cut-over is going to be mid-May. So as these theaters become AMC-branded theaters with more *potent marketing programs* and the like and *some targeted investment to*

---

[23] Emphasis added.
[24] Emphasis added.

*improve the product*, we think we'll see real benefits.

So we're not at all upset about all this. ***It's just more upside to come***. And I said it before, but I'll say it again, thank goodness we moved fast to get cost synergies because that's one of the things that allowed us to have a blowout quarter, even with these Carmike issues to deal with.[25]

149.    The statements referenced above in paragraphs 106-16, 118, 120-33, and 136-48 were materially false and misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business, operations, prospects, and legal compliance, which were known to the Individual Defendants or recklessly disregarded by them. Specifically, the Individual Defendants willfully or recklessly made false and misleading statements and omissions of material fact that failed to disclose that: (1) the operations of Carmike had been experiencing a prolonged period of financial underperformance due, in large part, to a protracted period of underinvestment in its theaters; (2) Carmike had experienced a significant loss in market share when its loyal patrons migrated to competitors that had renovated and upgraded their theaters; (3) AMC was able to retain only a very small number of Carmike's loyalty program members after the Carmike acquisition; (4) that the issues identified in (1)-(3) above were then having a material adverse effect on Carmike's operations and theater attendance and, in response, AMC planned to boost visitation levels at Carmike theaters by materially expanding promotional and capital investment spending activity, which was reasonably likely to have a material adverse effect on AMC's near term operating results; (5) the Company's representations about the seasonality of AMC's business were materially false and misleading; (6) the representations concerning Carmike's operations, the seasonality of its business, AMC's management's discussion and analysis of financial condition, and AMC's disclosure controls were materially false and misleading; (7) AMC failed to maintain adequate internal controls; and (8) that, as a result of the

---

[25] Emphasis added.

foregoing, the Company lacked a reasonable basis for its positive statements about AMC's then-current business and future financial prospects, including their statements relating to AMC's financial guidance, as well as the cost synergies associated with the "flawless" integration of Carmike.

150.    In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused or permitted the Company to make the false and misleading statements and omissions of material fact to the investing public as set forth above.

151.    Moreover, the Individual Defendants failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

152.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

**The Truth Emerges**

***August 1, 2017 Press Release***

153.    After markets closed on August 1, 2017, the Company issued a press release announcing its preliminary financial results for the quarter ended June 30, 2017. The press release announced expected revenues for the quarter of between $1.2 and $1.204 billion, and a net loss of between $178.5 million and $174.5 million—approximately $1.36 to $1.34 per diluted share. For fiscal 2017, the press release announced expected revenues of $5.1 to $5.23 billion, and a net loss of $150 to $125 million, or $1.17 to $0.97 per diluted share.

154.    On this news, the price per share of AMC stock dropped $5.60, or nearly 27%, to close at $15.20 on August 2, 2017.

*August 4, 2017 Conference Call*

155.    On August 4, 2017, the Company held a conference call with investors and analysts to discuss the Company's financial results for the quarter ended June 30, 2017. Defendant Aron stated that the quarter was "simply a bust," highlighting several reasons for AMC's poor quarterly results.

156.    One such reason was the seasonality of the Company's international business. Defendant Aron revealed, for the first time, that "Q2, seasonally, is often the smallest quarter of the year in Europe."

157.    During the question and answer session, a securities analyst asked if there was "a reason why [they] weren't able to disclose [the seasonality of AMC's international business]?" Defendant Aron responded that the reason for the non-disclosure was that AMC's international operations had been accounted for under international accounting standards. However, this answer appeared to be a non-sequitur, as the seasonality of the Company's international business is not dependent on the accounting standard used. Following these releases, analysts called out the seasonality of the Company's international business, with one analyst noting that such seasonality "played a role in our (and likely the Street's) mismodeling of the quarter."

158.    Defendant Aron highlighted Carmike's contribution to the Company's underwhelming Q2 financial results, explaining that "[o]ur legacy AMC theaters were stars, outperforming the industry, but our acquired Carmike theaters . . . were not stars." He further explained that during the quarter, nationwide box office revenues were down 4.4%, while admissions revenue at legacy AMC theaters was only down 3.1%. By contrast, the acquired Carmike theaters experienced a 11.3% decline during the quarter, which was 150% more than the national average.

159.     During the call's question and answer session, Defendant Aron identified "literally 6" different issues that had been having a material adverse effect on Carmike's operations and attendance, which the Company anticipated would not be resolved before 2018, and a loss of market share which occurred during 2016. Among the issues noted were: (1) only a small number of Carmike's loyalty program members were willing to join AMC's loyalty program after the acquisition; (2) Carmike had lost patronage to competitors that had upgraded and/or renovated their facilities; and (3) the closure of two of Carmike's "biggest, most successful" theaters.

160.     In pertinent part, Defendant Aron stated:

 [W]e mentioned this a little bit on the first quarter call, as we went back and looked, in 8 of the 12 months in '16, *Carmike, as a circuit, had declining market share*, including 3 of the past – 3 of the 4 months between September and December, *it had declining market share*. When you look at *what Carmike as a company* did between April and December *to modernize its circuit* after it put itself under contract to be sold, it *didn't do very much. And so the circuit essentially went on dead stop* around April-ish of – remember, we put them under contract in March, April-ish of '16, and we didn't get to change that until December of '16. What *we found* is that we've already gone through each of the several hundred Carmike theaters one by one with this – across the top – departmental team that I've told you about, and *there are literally 6 different reasons that tend to come up most often* as to what's going on in a particular theater.[26]

161.     With regard to the loyalty program, Defendant Aron represented that the Company would have to start "from scratch" following the Carmike acquisition:

I'll give you another. *When Carmike was handed over to us on December 21, only 200,000 individuals from their loyalty program joined our loyalty program*. Even though – even though, at the same time, AMC has over 9 million people from our loyalty program coming – stemming out of the – by then, it would have been about 7 million in the loyalty program. *So we've had to start the loyalty program essentially over from scratch*.[27]

162.     Defendant Aron concluded by noting some of the issues with Carmike, and opined on how long it might take to resolve those issues:

---

[26] Emphasis added.
[27] Emphasis added.

And as I said, there have been many identified issues. And they got to be knocked down one at a time. And *as we looked at the issues* that were floating around the Carmike circuit, *about 40% of the attendance issues in the Carmike circuit was because somebody came into town and put a recliner theater near a Carmike theater and Carmike never responded*. . . . *Another issue for Carmike is it had 2 of its biggest, most successful theaters that were closed for renovation*. And the theaters were closed for over a year. And they're just coming back on stream this summer. *So we're going to get a material bump theoretically by 2 of their biggest, strongest and best-performing theaters finally reopening and coming back online*. And it's literally issue-by-issue. . . . Can we turn this circuit around in 9 months? So is it January to March of '18? Or is it taking us 12 months and it's January to June of '18? Or does it taking us slightly longer than that? I don't know. But I'm hopeful that we can get it sorted out and turned in the first half of '18.[28]

163.    Once again, this represented a decrease in net sales compared to the same quarter the prior year when accounting for sales attributable to acquisitions.

164.    After announcing its disappointing results for the second quarter of 2017, the Company began selling assets, including its 50% stake in distribution company Open Road Films, which it had co-founded with rival Regal Entertainment.

## DAMAGES TO AMC

165.    As a direct and proximate result of the Individual Defendants' conduct, AMC will lose and expend many millions of dollars.

166.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its CEO, CFO, its Chief Accounting Officer, all of the members of its Board, and two former members of its Board, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

167.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

---

[28] Emphasis added.

168.     As a direct and proximate result of the Individual Defendants' conduct, AMC has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

169.     Plaintiff brings this action derivatively and for the benefit of AMC to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of AMC, unjust enrichment, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

170.     AMC is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

171.     Plaintiff is, and has been at all relevant times, a shareholder of AMC. Plaintiff will adequately and fairly represent the interests of AMC in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

172.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

173.     A pre-suit demand on the Board of AMC is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Aron, Hill, Koch, Pawlus, Saich, Locke, and Zeng (the "Directors"). Plaintiff needs only to allege

demand futility as to four of the seven Directors who are on the Board at the time this action is commenced.

174.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.  Indeed, each of the Directors are defendants in the Securities Class Actions.

175.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

176.    Additional reasons that demand on Defendant Aron is futile follow. Defendant Aron currently serves as the Company's CEO, and is thus, as the Company admits, a non-independent director. He received lavish compensation, including $10,932,004 in 2016, $4.5 million of which was a cash bonus related to the completion of the acquisitions noted above. Defendant Aron was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings and press releases referenced herein, almost all of which he personally made statements in or signed. His large Company stock holding, worth over $1.6 million before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As the Company's highest officer and

as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Aron is a defendant in the Securities Class Actions. For these reasons, too, Defendant Aron breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

177.    Additional reasons that demand on Defendant Koch is futile follow. Defendant Koch has served as a Company director since October 2014. Defendant Koch is, as the Company admits, a non-independent director. He received lavish compensation, including $158,704 in 2016. Defendant Koch is ultimately responsible for the false and misleading statements made in the Registration Statement and 2016 10-K, which he signed. His large Company stock holding, worth over $217,945 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Koch is a defendant in the Securities Class Actions. Thus, for these reasons, Defendant Koch breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

178.    Additional reasons that demand on Defendant Locke is futile follow. Defendant Locke has served as a Company director since February 2016. Defendant Locke is, as the Company admits, a non-independent director. He received lavish compensation, including $145,725 in 2016.

Defendant Locke is ultimately responsible for the false and misleading statements made in the Registration Statement and 2016 10-K, which he signed. His large Company stock holding, worth over $134,867 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Locke is a defendant in the Securities Class Actions. Thus, for these reasons, Defendant Locke breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

179.    Additional reasons that demand on Defendant Zeng is futile follow. Defendant Zeng has served as a Company director since February 2016 and as non-executive Chairman since March 14, 2018. Defendant Zeng is president of Wanda Cinema Line Co, Ltd., a subsidiary of Wanda, and is thus, as the Company admits, a non-independent director. Defendant Zeng is ultimately responsible for the false and misleading statements made in the Registration Statement and 2016 10-K, which he signed. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Zeng is a defendant in the Securities Class Actions. Thus, for these reasons, Defendant Zeng breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

180.    Additional reasons that demand on Defendant Pawlus is futile follow. Defendant Pawlus has served as a Company director since December 2014 and is Chair of the Audit Committee. She received lavish compensation, including $163,704 in 2016. Defendant Pawlus is ultimately responsible for the false and misleading statements made in the Registration Statement and 2016 10-K, which she signed. Her large Company stock holding, worth over $258,794 before the fraud was exposed, reveals her interest in keeping the Company's stock price as high as possible. As a director and Chair of the Audit Committee, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Pawlus is a defendant in the Securities Class Actions. Thus, for these reasons, Defendant Pawlus breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

181.    Additional reasons that demand on Defendant Hill is futile follow. Defendant Hill has served as a company director since December 2013 and sits on the Audit Committee. He received lavish compensation, including $168,704 in 2016. Defendant Hill is ultimately responsible for the false and misleading statements made in the Registration Statement and 2016 10-K, which he signed. His large Company stock holding, worth over $410,371 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant

Hill is a defendant in the Securities Class Actions. Thus, for these reasons, Defendant Hill breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

182.    Additional reasons that demand on Defendant Saich is futile follow. Defendant Saich has served as a Company director since August 2012. He received lavish compensation, including $163,704 in 2016. Defendant Saich is ultimately responsible for the false and misleading statements made in the Registration Statement and 2016 10-K, which he signed. His large Company stock holding, worth over $128,221 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Saich is a defendant in the Securities Class Actions. Thus, for these reasons, Defendant Saich breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

183.    Additional reasons that demand on the Board is futile follow.

184.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently of Wanda and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

185.    Directors Zeng and Anon, like former director Zhang, have close business associations with Wanda, in that they rely on Wanda subsidiaries for their livelihood. Wanda was highly interested in the acquisitions and has been acquiring media assets outside of China for some time, including Legendary Entertainment for $3.5 billion. According to the 2017 proxy statement, Wanda "agreed to make a capital contribution of $10,000,000 to AMC (without any increase in Wanda's economic interest or voting rights in the Company) for payment to certain officers, directors, and other personnel for extraordinary services rendered in connection with merger and acquisition activity in 2016." This support came despite denials from AMC that any funding from Wanda was used to complete any of the acquisitions. As a result of these close business associations, Directors Zen and Anon are beholden to Wanda, and therefore, demand as to them is excused.

186.    In violation of the Code of Ethics, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act. In further violation of the Code of Ethics, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Ethics. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

187.    AMC has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for AMC any part

of the damages AMC suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

188.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

189.    The acts complained of herein constitute violations of fiduciary duties owed by AMC's officers and directors, and these acts are incapable of ratification.

190.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of AMC. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of AMC, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists,

will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

191.    If there is no directors' and officers' liability insurance, then the Directors will not cause AMC to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

192.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934**

193.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

194.    The claims made pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), that are alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

195.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent

or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

196.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

197.   Under the direction and watch of the Directors, the 2017 Proxy Statement failed to disclose that: (1) the operations of Carmike had been experiencing a prolonged period of financial underperformance due, in large part, to a protracted period of underinvestment in its theaters; (2) Carmike had experienced a significant loss in market share when its loyal patrons migrated to competitors that had renovated and upgraded their theaters; (3) AMC was able to retain only a very small number of Carmike's loyalty program members after the Carmike acquisition; (4) that the issues identified in (1)-(3) above were then having a material adverse effect on Carmike's operations and theater attendance and, in response, AMC planned to boost visitation levels at Carmike theaters by materially expanding promotional and capital investment spending activity, which was reasonably likely to have a material adverse effect on AMC's near term operating results; (5) the Company's representations about the seasonality of AMC's business were materially false and misleading; (6) the representations concerning Carmike's operations, the seasonality of its business, AMC's management's discussion and analysis of financial condition, and AMC's disclosure controls were materially false and misleading; (7) AMC failed to maintain adequate internal controls; and (8) that, as a result of the foregoing, the Company lacked a reasonable basis for its positive statements about AMC's then-current business and future financial

prospects, including their statements relating to AMC's financial guidance, as well as the cost synergies associated with the "flawless" integration of Carmike.

198.   Moreover, the 2017 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Ethics, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

199.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017 Proxy Statement, including election of directors, advisory approval of executive compensation, and appointment of an independent auditor.

200.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

201.   Plaintiff on behalf of AMC has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

202.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

203.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AMC's business and affairs.

204.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

205.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of AMC.

206.    In breach of their fiduciary duties owed to AMC, the Individual Defendants willfully or recklessly made false and misleading statements and omissions of material fact that failed to disclose that: (1) the operations of Carmike had been experiencing a prolonged period of financial underperformance due, in large part, to a protracted period of underinvestment in its theaters; (2) Carmike had experienced a significant loss in market share when its loyal patrons migrated to competitors that had renovated and upgraded their theaters; (3) AMC was able to retain only a very small number of Carmike's loyalty program members after the Carmike acquisition; (4) that the issues identified in (1)-(3) above were then having a material adverse effect on Carmike's operations and theater attendance and, in response, AMC planned to boost visitation levels at Carmike theaters by materially expanding promotional and capital investment spending activity, which was reasonably likely to have a material adverse effect on AMC's near term operating results; (5) the Company's representations about the seasonality of AMC's business were materially false and misleading; (6) the representations concerning Carmike's operations, the seasonality of its business, AMC's management's discussion and analysis of financial condition, and AMC's disclosure controls were materially false and misleading; and (7) that, as a result of the foregoing,  the Company lacked a reasonable basis for its positive statements about AMC's then-current business and future financial prospects, including their statements relating to AMC's financial guidance, as well as the cost synergies associated with the "flawless" integration of Carmike.

207.     The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

208.     Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

209.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AMC's securities.

210.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AMC's securities.

211.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

212.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, AMC has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

213.     Plaintiff on behalf of AMC has no adequate remedy at law.

### THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

214.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

215.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, AMC.

216.     The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from AMC that was tied to the performance or artificially inflated valuation of AMC, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

217.     Plaintiff, as a shareholder and a representative of AMC, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

218.     Plaintiff on behalf of AMC has no adequate remedy at law.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of AMC, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to AMC;

(c)     Determining and awarding to AMC the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing AMC and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AMC and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of AMC to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding AMC restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: May 21, 2018                     Respectfully submitted,

**WALTERS RENWICK RICHARDS
SKEENS & VAUGHAN, P.C.**


_s/ Karen Wedel Renwick_____
KAREN W. RENWICK, Ks. Bar #12095
R. FREDERICK WALTERS, Ks. Dist. #70561
1100 Main Street, Suite 2500
Kansas City, Missouri  64105
Telephone: (816) 421-6620
Fax: (816) 421-4747
krenwick@wrrsvlaw.com
fwalters@wrrsvlaw.com


**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com


**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net


_Counsel for Plaintiff_

<u>VERIFICATION</u>

I, Naranbold Gantulga  am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this   th day of May, 2018.

5/7/2018 12:17:56 AM PDT

_____
Naranbold Gantulga